**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ARTHUR STEWART, | |
| Plaintiff, | Case No. 3:20-cv-1938 (CSH) |
| v. | |
| OFFICER AYALA, COUNSELOR SUPERVISOR RILEY, INDUSTRIES SUPERVISOR REY MUNROE, OPERATIONS OFFICER JOHN OR JANE DOE, DHO LIEUTENANT DAVIS, OFFICER GRADY, COUNSELOR SUPERVISOR MOORE, COUNSELOR SUPERVISOR GAMARDELLA[1], WARDEN GUARDARAMA, DEPUTY WARDEN HINES, ACTING COMMISSIONER ANGEL QUIROS, and COUNSELOR ALBANO, | SEPTEMBER 20, 2022 |
| Defendants. | |

<u>**INITIAL REVIEW ORDER**</u>

**HAIGHT, Senior District Judge:**

Plaintiff Arthur Stewart is a sentenced state prisoner who was formerly incarcerated at Osborn Correctional Institution ("Osborn") of the Connecticut Department of Correction ("DOC").[2] He filed a Complaint[3] *pro se* pursuant to 42 U.S.C. § 1983 ("Section 1983") against

---

[1] The Clerk is instructed to correct the docket to reflect the spelling of this Defendant's name as Gamardella.

[2] Review of Plaintiff's attachments shows that Plaintiff was a prisoner whose sentence commenced on December 10, 2004. *See id.* at 43 (Time Sheet). Plaintiff has informed the Court of his change of address, indicating that he is no longer in custody. *See* Doc. 12.

[3] Two months after filing his First Amended Complaint, Doc. 11, Plaintiff filed a self-styled "Second Amended Complaint," Doc. 14, which is identical in substance to the First Amended Complaint but, unlike the First Amended Complaint, is notarized. The Court treats Doc. 14 as the operative Complaint.

twelve DOC employees in their individual and official capacities: Correction Officer Ayala, Counselor Supervisor Riley, Industries Supervisor Rey Munroe, Operations Officer John or Jane Doe, Disciplinary Hearing Officer Lieutenant Davis, Correction Officer Grady, Counselor Supervisor Gamardella, Counselor Supervisor Moore, Deputy Warden Hines, Warden Guardarama, Acting Commissioner Angel Quiros, and Correction Officer Albano. Doc. 14 ¶¶ 2–13. Plaintiff alleges that Defendants violated his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments and are liable for intentional infliction of emotional distress under Connecticut tort law. *Id.* ¶¶ 42–43. He requests monetary damages and sues all Defendants in both their official and individual capacities. *Id.* ¶¶ 2–13, 44.

Pursuant to 28 U.S.C. § 1915A, the Court must conduct an initial review of Plaintiff's Complaint to determine whether Plaintiff's claims are plausible. *Id.* ¶ 43.

## STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." *See* 28 U.S.C. § 1915A(b)(1)–(2); *Abrams v. Waters*, No. 3:17-CV-1659 (CSH), 2018 WL 2926294, at *3 (D. Conn. June 8, 2018).

A complaint is adequately pled if its allegations, accepted as true and liberally construed, could "conceivably give rise to a viable claim." *See Green v. Martin*, 224 F. Supp. 3d 154, 160 (D. Conn. 2016) (citing *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005)). Although highly detailed allegations are not required, the complaint must state a claim that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)); *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017). A complaint states a

claim that is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, the Court is not bound to accept "conclusory allegations." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). Nor does a complaint suffice if it tenders "naked assertions" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S at 557).

If a plaintiff is proceeding pro se, it is well-established that his or her complaint "must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 Fed. Appx. 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)); *see also Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008) ("a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers"); *Rodriguez v. Cook*, No. 3:20-CV-1902 (CSH), 2022 WL 4104100, at *1 (D. Conn. Sept. 8, 2022). This liberal approach, however, does not exempt pro se litigants from the minimum pleading requirements described above: A pro se plaintiff's complaint still must "'state a claim to relief that is plausible on its face.'" *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Therefore, even in a pro se case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted), and the Court may not "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## FACTUAL ALLEGATIONS

The following factual allegations in Plaintiff's amended complaint are accepted as true only for purposes of this Order.

Plaintiff is an African-American male who is more than fifty years old. Doc. 14 ¶ 25.

In May or June 2020 during the Ramadan fast, Plaintiff observed a non-Muslim inmate handling and touching food without protective gloves or a hairnet. *Id.* ¶ 14. Muslim practice requires that only Muslims serve and pray over food before it may be eaten during Ramadan. *Id.* ¶ 15. Plaintiff confronted Officer Ayala about her choice of a non-Muslim inmate to serve food to Muslims within the H-Block housing unit, and about permitting the inmate to serve food without a hairnet and gloves. *Id.* ¶¶ 15–16.

Officer Ayala responded that she did not care about Muslim tradition, stating that if left up to her, "you, towel heads would not eat at all during your month of purification and prayer." *Id.* ¶ 16. She went on to say, "Get your Towel Head ass in your cell." *Id.* ¶ 17. Plaintiff expressed to her that he was concerned about maintaining the traditions and respectfulness of his religion. *Id.* Officer Ayala responded that she would have him fired from his industry job (in which Plaintiff made $167 a month) and kicked out of the privilege workers housing block for pushing this issue. *Id.* ¶ 18. Although Plaintiff had no disciplinary reports within the last four years, Officer Ayala informed her best friend, Addiction Services Counselor Supervisor Riley, that she wanted Plaintiff "out of" the H-Block unit. *Id.* ¶¶ 18–19.

On June 23, 2020, Counselor Supervisor Riley came to Plaintiff's cell to retaliate against Plaintiff on behalf of Officer Ayala. *Id.* ¶ 19. Counselor Supervisor Riley, who is responsible for assigning inmates to programs, asked Plaintiff to sign a new program participation agreement called the Offender Accountability Plan ("OAP"). *Id.* ¶¶ 20–21. Riley indicated that the new OAP consisted of a six-month drug program; however, Plaintiff noted that the OAP would not be meaningful for him because he would be out of prison in five months. *Id.* Riley told him to think about

signing the OAP and that she would get back to him, and then she left to check his end-of-sentence date. *Id.* ¶ 21.

A few hours later, a correction officer brought Plaintiff a disciplinary report and stated that Plaintiff had "pissed off the wrong woman." *Id.* ¶ 22. Plaintiff responded that he had not done anything wrong. *Id.* The disciplinary report from Counselor Supervisor Riley charged Plaintiff with refusing the Tier IV Program as stipulated in his OAP, refusing to sign the offender work performance and program removal refusal form, and using volatile language to express his disinterest in the Tier IV Program. *Id.* ¶ 23.

Counselor Supervisor Riley issued the disciplinary report out of spite; she and Officer Ayala knew that the only way to have Plaintiff leave the H-Block housing unit was to issue him a false disciplinary report. *Id.* ¶ 24. They conspired to use the false pretense that Plaintiff refused to sign his new OAP in order to get him fired from his job and moved out of the housing unit. *Id.* Plaintiff did not refuse to sign the paper presented by Riley but stated that he would be home in five months. *Id.* Riley left to determine if he was being truthful but never returned to inform him whether he should take the Drug Program, as she had previously indicated. *Id.* When the investigating officer asked Plaintiff to sign the disciplinary report, he refused because it contained false accusations. *Id.*

The Drug Program proposed by Riley would also have placed Plaintiff in danger of contracting COVID-19 because there was no social distancing for the twenty to thirty inmates in the Program, who had to gather in a small enclosed room with no ventilation, masks, or hand sanitizer. *Id.* ¶ 25.

Two months later, Counselor Supervisors Moore and Gamardella attempted to issue a disciplinary report to Plaintiff alleging the same charge, of refusal to sign a new OAP, allegedly in

retaliation for his complaints about the Program's noncompliance with CDC standards for protecting against the spread of COVID-19. *Id.* ¶ 26. Plaintiff sent letters to Officer Moore stating that he did not want to be placed in a hazardous living condition such as a dorm unit with thirty or forty inmates living, sleeping, and having programming in a small room. *Id.* ¶ 26, pp. 26–34. Plaintiff received no response. *Id.* ¶ 26.

On July 28, 2020, Counselor Supervisor Moore came to Plaintiff's new housing unit and informed him that if he did not do what correctional staff wanted him to do, he would "continue to write . . . up false Disciplinary Reports" that "no one will ever doubt." *Id.* ¶ 27. Moore further stated, "I'm God in Department of Corrections, what I say goes." *Id.* Plaintiff walked away from him but did not respond to his request or demand. *Id.* ¶ 28. Counselor Supervisor Moore looked like he wanted to hit Plaintiff—he was speaking with his hand in a tight first—and was trying to provoke Plaintiff into a confrontation in order to issue him a disciplinary report and place him in punitive segregation. *Id.*

Plaintiff asked Counselor Supervisor Moore to let him be, as Plaintiff did not want any problems. *Id.* ¶ 29. Moore responded, "You should have thought about that before disrespecting my friend Ayala." *Id.* Plaintiff returned to his cell. *Id.* He heard Moore yell out loud in front of other inmates: "I knew you were a Bitch." *Id.*

One hour later, Plaintiff received another disciplinary report from Counselor Supervisor Moore. *Id.* ¶ 30. Moore's disciplinary report charged Plaintiff with the same misconduct from June 23, 2020 as did his prior disciplinary report issued by Counselor Supervisor Riley, for which Plaintiff had already received sanctions and been punished. *Id.* ¶¶ 31–33. The disciplinary report issued by Moore was later dismissed. *Id.* ¶ 34.

On August 21, 2020, Plaintiff notified the Connecticut State Police about the false disciplinary report issued by Moore. *Id.* ¶ 35. At the time of his writing the Second Amended Complaint, Plaintiff did not know if his allegation had been investigated by the police. *Id.*

Moore's disciplinary report has caused Plaintiff injury because it prevented him from having a single cell, prison employment, early release programs, or attending prison programs to assist with his reintegration prior to his release. *Id.* ¶ 36. Plaintiff was also placed in a housing unit known to be a COVID-19 hot zone within Osborn. *Id.* He in fact contracted COVID-19 there. *Id.*

As part of a conspiracy to remove him from his single cell in H-Block, Defendants Moore, Gamardella, Ayala, Munroe, and Grady all participated in a retaliatory scheme to place Plaintiff in C-Block because he had complained to the administration and religious chaplain that non-Muslims, in violation of his religious beliefs, were serving food during Ramadan. *Id.* ¶ 37.

Plaintiff believes that he was placed in C-Block Housing to be punished for his religious beliefs and that Defendants deliberately placed him in a housing unit where he would be exposed to COVID-19 because he is a Muslim. *Id.* ¶ 38.

Plaintiff attempted to exhaust his administrative remedies to resolve his complaints about unconstitutional conduct by Defendants Albano, Ayala, Moore, Riley, Munroe, Grady, and Gamardella, but Defendants "intercept[ed]" his complaints, preventing him from exhausting his administrative remedies. *Id.* ¶ 39.

At Plaintiff's Disciplinary Hearings, Officers Grady and Davis denied him his due process rights; Officer Grady kicked Plaintiff out of his office and stated that the only due process he would receive was a guilty verdict, as "correctional officers are always right." *Id.* ¶ 40.

Plaintiff notified Deputy Warden Hines, Warden Guardarama, and Acting Commissioner Quiros about Defendants' misconduct, but these Defendants failed to respond to his letters or to take any action. *Id.* ¶ 41, pp. 28–36 (copies of letters and inmate grievance form).

## DISCUSSION

The Court will address whether Plaintiff's factual allegations have asserted any violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, and whether Plaintiff has stated a claim of intentional infliction of emotional distress under Connecticut tort law. Plaintiff alleges nine specific counts for failure to protect, failure to act, deliberate indifference, intentional infliction of emotional distress, unconstitutional conditions of confinement, retaliation, cruel and usual punishment, denial of due process, and denial of freedoms of speech and religion. Doc. 14 ¶ 43.

The Court will first consider whether Plaintiff has stated plausible Fourteenth Amendment due process and First Amendment retaliation claims based on the allegedly false disciplinary charges.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted).

A prison inmate such as Plaintiff "has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.

1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). Plaintiff has raised the "two exceptions to this rule: when an inmate is "able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the disciplinary report was issued in retaliation for exercising a constitutionally protected right." *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (citation and internal quotation marks omitted); *Velez v. Burge*, 483 F. App'x 626, 628 (2d Cir. 2012) ("[An] inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights."); *Shand v. Parsons*, No. 3:20-CV-28 (CSH), 2020 WL 1989151, at *3 (D. Conn. Apr. 27, 2020).

### A. Fourteenth Amendment Procedural Due Process

Plaintiff claims that Defendants violated his Fourteenth Amendment due process rights by issuing, and punishing him for, false disciplinary charges. Doc. 14 ¶¶ 37, 40, 41.

The Court sets forth herein the relevant Fourteenth Amendment due process standards. The analysis for a procedural due process claim "proceeds in two steps: a court first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam).

In the prison context, which involves persons whose liberty interests have already been severely restricted because of their confinement, a plaintiff cannot show a cognizable deprivation of "liberty" unless he can show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Second Circuit has also explained that courts must examine the actual punishment received, as

well as the conditions and duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009) (per curiam); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

In *Sandin*, the prisoner brought a Section 1983 action against several prison officials alleging that they had violated his constitutional right to procedural due process by sentencing him to disciplinary segregation without permitting him to call certain witnesses. *See Sandin*, 515 U.S. at 476. The Supreme Court rejected the contention that any action taken by correctional officials as a punitive measure necessarily encroaches upon a liberty interest protected by the Due Process Clause. *See id.* at 484. Rather, the Supreme Court held that a prisoner who was subjected to a disciplinary term of thirty days of confinement in restrictive housing did not sustain a deprivation of a liberty interest in violation of the Fourteenth Amendment's Due Process Clause. *See id.* Given the prisoner's indeterminate sentence of thirty years to life, his confinement in disciplinary segregation for thirty days "did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." *Id.* at 486. The Supreme Court concluded that such confinement did not constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" inasmuch as "[t]he regime to which [the prisoner] was subjected . . . was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 484, 486–87.

With *Sandin*'s guidance in mind, I have previously addressed whether prisoners have alleged a cognizable deprivation of "liberty"—that is, whether they have plausibly alleged that they experienced an "atypical and significant hardship." Toward one end of the spectrum, I explained that:

> [The plaintiff's] twenty-day confinement in segregation, falling well short of thirty days, does not, in and of itself, constitute a sufficient deprivation of liberty subject to due process protection. This twenty-day restriction imposes no "atypical and significant hardship" in relation to the fifty-one (51) year term of imprisonment to

which [the plaintiff] was sentenced for attempted murder, assault, and criminal possession of a firearm.

*Abrams v. Waters*, No. 3:17-CV-1659 (CSH), 2018 WL 691717, at *12 (D. Conn. Feb. 2, 2018). On the other hand, where a plaintiff alleged that he was placed in administrative segregation for a much longer period of time, I have held in an initial review order that:

Plaintiff's Complaint shows that he was committed to Administrative Segregation for more than 101 days. "Such a period of segregated confinement would ordinarily preclude dismissing a claim without fact-finding." [*Ellerbe v. Jason*, No. 12 Civ. 580 (MPS), 2015 WL 1064739, at *5 (D. Conn. Mar. 11, 2015).] Plaintiff may, therefore, meet the first *Sandin* requirement of a deprivation of a liberty interest imposing an atypical and significant hardship; and, further factfinding is needed.

*Campbell v. Lantz*, No. 19 Civ. 1512 (CSH), 2019 WL 6771417, at *8 (D. Conn. Dec. 12, 2019).

Turning to the case at bar, Plaintiff's Disciplinary Summary Report shows that he sustained a forfeiture of twenty-five days of Risk Reduction Earned Credit ("RREC") but no imposition of punitive segregation or loss of privileges as a result of the guilty finding. Doc. 14 at 22. Although the loss of RREC may have prolonged the time that Plaintiff remained incarcerated, Plaintiff cannot proceed with his due process claim under 42 U.S.C. § 1983.

"When a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994); *Austin v. Cuomo*, No. 1:20-CV-00893, 2020 WL 7352664, at *5 (W.D.N.Y. Dec. 15, 2020). This is because "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of [section] 1983." *Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973). In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court made clear

that *Heck*'s favorable termination rule applies to challenges made under Section 1983 to proce-

dures used in prison disciplinary proceedings that deprived a prisoner of good time credits. *Id.* at

646 ("The principal procedural defect complained of by respondent would, if established, neces-

sarily imply the invalidity of the deprivation of his good-time credits.").

"If an inmate earns RREC, the application of RREC to an inmate's sentence affects the

overall duration of the inmate's confinement" and "in general, a claim regarding the length of

one's sentence must be brought as a habeas claim." *See Green v. Riffo*, No. 3:18-CV-960 (CSH),

2019 WL 2302412, at *9 (D. Conn. May 29, 2019). Plaintiff has not alleged or shown that he has

invalidated his conviction through a habeas petition in state court. Accordingly, Plaintiff's Section

1983 due process claim is barred by *Heck*.

Moreover, Plaintiff's forfeiture of RREC as a result of his guilty finding does not raise a

plausible liberty interest. RREC is governed by Connecticut General Statutes § 18-98e, which

provides that an inmate may

> earn risk reduction credit for adherence to the inmate's offender accountability
> plan, for participation in eligible programs and activities, and for good conduct and
> obedience to institutional rules as designated by the commissioner, provided (1)
> good conduct and obedience to institutional rules alone shall not entitle an inmate
> to such credit, and (2) the commissioner or the commissioner's designee may, in
> his or her discretion, cause the loss of all or any portion of such earned risk reduc-
> tion credit for any act of misconduct or insubordination or refusal to conform to
> recommended programs or activities or institutional rules occurring at any time
> during the service of the sentence or for other good cause. If an inmate has not
> earned sufficient risk reduction credit at the time the commissioner or the commis-
> sioner's designee orders the loss of all or a portion of earned credit, such loss shall
> be deducted from any credit earned by such inmate in the future.

Conn. Gen. Stat. § 18-98e(b). Thus, Plaintiff cannot assert a Fourteenth Amendment claim on the

basis of his RREC forfeiture because Connecticut law confers no liberty interest in earned or future

risk reduction credit.[4] *Petaway v. Osden*, No. 3:17-CV-00004 (VAB), 2019 WL 1877073, at *4 (D. Conn. Apr. 26, 2019), *aff'd on other grounds*, 827 F. App'x 150 (2d Cir. 2020) (noting RREC "is discretionary in nature and confers no liberty interest in earned or future risk reduction credit.") ((citing *Green v. Comm'r of Correction*, 184 Conn. App. 76, 86–87, 194 A.3d 857, 864 (2018) and *Perez v. Comm'r of Correction*, 326 Conn. 357, 370–72 (2017).

Plaintiff further complains that Riley used a "classification program" to cause Plaintiff to lose his prison job and move out of his housing block, and that Moore's disciplinary report also stopped him from working and attending programs to assist in his reintegration. Doc. 14 ¶¶ 20, 24, 36. However, Plaintiff cannot premise a due process claim on the loss of his work assignment or ability to participate in certain programming. Generally, inmates have no constitutionally protected interest in an assignment to a particular prison job or participation in a particular program absent "(1) a state statute or regulation, in 'language of an unmistakably mandatory character'; and (2) evidence that the deprivation of employment, in violation of that statute or regulation, 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ashby v. Quiros*, No. 3:17-CV-916 (CSH), 2018 WL 6704744, at *7 (D. Conn. Dec. 20, 2018) (quoting *Hewitt v. Helms*, 459 U.S. 460, 471 (1983)); *Taylor v. Levesque*, 246 F. App'x 772, 774 (2d Cir. 2007) ("It is well settled that prisoners generally do not have a protected liberty interest in classifications that impact their eligibility to participate in rehabilitative programs. . . . Moreover, Connecticut has not granted inmates, by regulation or statute, a protected interest in their security classification; the matter is committed to the discretion of the Commissioner of Corrections.").

---

[4] By contrast, a prisoner cannot be deprived of credit under the good credit statute, Connecticut General Statutes § 18-7a, without due process. *Jolley v. Commissioner of Correction,* 60 Conn. App. 560, 561 (2000), *cert. denied*, 274 Conn. 913 (2005); *Petaway*, No. 3:17-CV-00004 (VAB), 2019 WL 1877073, at *4.

This Court has generally rejected inmate claims asserting a due process interest based on a prison work assignment loss. *See Delgado*, No. 3:20-CV-787 (SRU), 2020 WL 4926615, at *7 (D. Conn. Aug. 21, 2020) (no right to prison job); *Groomes v. Frazir*, 3:17-CV-1072 (JCH), 2017 WL 7410991, at *5 (D. Conn. Nov. 2, 2017) (same); *but see Ashby,* No. 3:17-CV-916 (CSH), 2018 WL 6704744, at *7 (citing federal and state law authorities reflecting no protected due process interest in prison employment but concluding that state statute created a liberty interest in prisoner employment for inmate on death row whose convictions were being appealed, where Connecticut General Statute § 18-10a requires "employment and utilization of prisoners under sentence of death whose convictions are being appealed").

Likewise, Plaintiff cannot assert that his transfer to a different housing unit constitutes a liberty interest because the DOC Commissioner has discretion to determine the appropriate housing and classification for an inmate. *McKinnon v. Chapdelaine*, 2013 WL 951324, at *1 (Conn. Super. Ct. Feb. 13, 2013) ("Our courts have clearly held that a prisoner has no liberty interest in his classification or assignment within the prison system because the commissioner of correction has discretion to classify or transfer prisoners held in his custody."); *see also* Conn. Gen. Stat. § 18–86 ("The commissioner may transfer any inmate of any of the institutions or facilities of the department to any other such institution or facility . . . when it appears to the commissioner that the best interests of the inmate or the other inmates will be served by such action"); *see also Olim v. Wakinekona,* 461 U.S. 238, 248 (1983) (prisoners have no constitutionally protected right to be confined in any particular correctional facility). Accordingly, the Court must dismiss as not plausible Plaintiff's claim of a Fourteenth Amendment due process violation.

### B. First Amendment Retaliation

Plaintiff alleges that (1) Counselor Supervisor Riley issued a false disciplinary report alleging that Plaintiff refused to sign a new OAP in order to retaliate against Plaintiff on behalf of Officer Ayala, to whom Plaintiff had complained about food service during Ramadan, Doc. 14 ¶ 19; (2) Counselor Supervisors Moore and Gamardella attempted to issue Plaintiff another retaliatory false disciplinary report alleging that Plaintiff refused to sign a new OAP because Plaintiff had complained about prison conditions, *id.* ¶ 26; and (3) Moore, Gamardella, Ayala, Munroe, and Grady participated in a scheme to place Plaintiff in C-Block out of retaliation because Plaintiff had complained to the administration and religious chaplain that non-Muslims were serving food during Ramadan, *id.* ¶ 37. The Court will next consider whether these state plausible claims of First Amendment retaliation.

"To prevail on a First Amendment retaliation claim, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019).

Protected speech or activity includes, for example, filing a lawsuit, an administrative complaint, or a prison grievance. *See id.* ("The filing of prison grievances is a protected activity."); *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted); *Booth v. Comm'r of Corr.*, No. 19-CV-100 (MPS), 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances is protected activity.") (citation omitted). Although not all oral speech by an inmate constitutes

protected activity, some courts within the Second Circuit have determined that verbal or oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim. *See McIntosh v. United States,* No. 14-CV-7889 (KMK), 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) (collecting cases).

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon*, 938 F.3d at 40 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In order to allege causation, the inmate must state facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)). "[F]acts often used to determine retaliatory motive . . . include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019).

Courts treat prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation omitted). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (internal quotations and citation omitted).

*1. Retaliation by Counselor Supervisor Riley*

According to Plaintiff, Counselor Supervisor Riley retaliated against him by issuing a false disciplinary report after Plaintiff complained to Officer Ayala that the food service did not comply with Muslim traditions during Ramadan. Doc. 14 ¶ 19. For purposes of initial review, the Court treats Plaintiff's oral complaint to Officer Ayala about his religious concerns as protected conduct satisfying the first element of the retaliation analysis. *Cf. McIntosh*, 2016 WL 1274585, at *26.

As to the second element, a plaintiff may allege plausible adverse action based on a defendant's issuance of an allegedly false misbehavior report. *See Alston v. Chapdelaine*, No. 15 Civ. 434 (CSH), 2016 WL 543105, *6–7 (D. Conn. Feb. 10, 2016). Here, Plaintiff alleges that Riley promised that he could think about signing his OAP for a few days, and then soon thereafter, she had him served with a disciplinary report for refusing to sign his OAP. *Id.* ¶¶ 21–22. Plaintiff's allegations raise at least an inference that Plaintiff did not actually refuse to sign the OAP and that the disciplinary charges filed by Riley were therefore false.

As to the third prong, crediting Plaintiff's stated facts as true, the Court concludes that Plaintiff's allegations, although verging on conclusory, are sufficient at this stage to suggest that Plaintiff's protected conduct was a substantial or motivating factor in Riley's decision to issue Plaintiff a disciplinary report for failure to sign his OAP despite promising that he could think about it for a few days. *See* Doc. 14 ¶¶ 21–22. Plaintiff has alleged that Officer Ayala informed Riley that she wanted Plaintiff out of H-Block, and that Officer Ayala allegedly expressed anti-Muslim sentiment after Plaintiff complained about the food service in H-Block. Doc. 14 ¶¶ 16–18. Plaintiff has also alleged that Riley and Ayala were friends, ate lunch together, spent time together after working hours, and relied upon each other when they were in "tight spots." *Id.* ¶ 22.

Accordingly, at this initial stage, the Court will permit this claim to proceed against Officer Ayala and Counselor Supervisor Riley.

### 2. Retaliation by Counselor Supervisors Moore and Gamardella

Plaintiff alleges that Moore and Gamardella issued him another retaliatory false disciplinary report for refusing to sign a new OAP because he had complained to Moore about the hazardous living conditions of his dorm housing unit, including gatherings of more than ten people, which were prohibited within DOC to limit the spread of COVID-19. *See* Doc. 14 ¶ 26.

"A prisoner has a right under the First Amendment to complain about prison conditions, especially conditions that the prisoner believes endanger his health and safety." *Gomez v. Dep't of Corr.*, No. 3:20-CV-00958 (JAM), 2020 WL 6526108, at *3 (D. Conn. Nov. 4, 2020). Thus, for initial pleading purposes, Plaintiff's oral complaint to Moore about prison conditions is sufficient to satisfy the first prong of the retaliation analysis on Plaintiff's claim against Moore.

Plaintiff states that Moore issued him with a false disciplinary report on July 28, 2021 charging him for refusing to sign his OAP on June 23, 2020, although he had already been charged by Riley's disciplinary report and found guilty for the same conduct. Doc. 14 ¶¶ 32–33, pp. 21–24. Plaintiff's allegation that this disciplinary report was later "thrown out" suggests, under the standard laid out in *Ramos*, 2019 WL 2422875, at *2, that Moore may have issued the report for retaliatory rather than actual disciplinary reasons. For purposes of initial review, the Court concludes that Plaintiff's allegations are sufficient to raise a retaliation claim against Moore.

However, Plaintiff has not alleged any nonconclusory facts about Counselor Supervisor Gamardella's retaliatory conduct toward Plaintiff. Plaintiff has alleged only that Gamardella attempted to issue the disciplinary report, but alleges no specific and detailed facts to suggest a

causal connection between Plaintiff's protected activity and Gamardella's alleged attempt to issue a disciplinary report. Accordingly, the Court will dismiss the retaliation claim against Gamardella.

### 3. Retaliatory conspiracy by Moore, Gamardella, Ayala, Munroe, and Grady due to Plaintiff's religious complaints

Plaintiff asserts that Moore, Gamardella, Ayala, Munroe, and Grady conspired to place him in C-Block in retaliation for his complaints to the administration and religious chaplain about non-Muslims serving food to Muslim inmates during Ramadan. Doc. 14 ¶ 37.

Allegations of conspiracy can be neither vague nor conclusory but must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy." *See Storck v. Suffolk Cnty. Dep't of Soc. Servs.,* 62 F. Supp. 2d 927, 940 (E.D.N.Y.1999); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir. 2002). ("[C]onclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights" are insufficient.). A conspiracy claim under § 1983 requires the plaintiff to show "(1) an agreement between two or more state actors or between a state actor and a private entity, (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal, causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999).

Where all of the defendants are members of the same organization, any conspiracy claim is barred by the intracorporate conspiracy doctrine. *See Fed. Ins. Co. v. United States*, 882 F.3d 348, 368 n.14 (2d Cir. 2018) (noting that "because employees acting within the scope of their employment are agents of their employer, an employer and its employees are generally considered to be a single actor, rather than multiple conspirators."); *Burrell v. Quiros*, No. 3:21-CV-393 (KAD), 2021 WL 1239916, at *6 (D. Conn. Apr. 2, 2021) ("Although the Second Circuit has not yet considered whether the intracorporate conspiracy doctrine applies to section 1983 cases,

district courts within the Second Circuit have applied the doctrine in section 1983 cases and, in particular, to section 1983 cases filed by prisoners."). However, the intracorporate conspiracy doctrine does not apply when individuals are "pursuing personal interests wholly separate and apart from the entity." *Ali v. Connick*, 136 F. Supp. 3d 270, 282–83 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). To meet the exception, a Plaintiff must do more than simply allege that the defendants were motivated by personal bias against him. *See Vega v. Artus*, 610 F. Supp. 2d 185, 205 (N.D.N.Y. 2009) (holding that "in order to allege facts plausibly suggesting that individuals were pursuing personal interests wholly separate and apart from the entity" to overcome the intracorporate conspiracy doctrine, "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against plaintiff.").

Plaintiff has alleged that Officer Ayala informed him in May or June 2020, after his complaints regarding food service during Ramadan, that she would have him fired from his industry job and kicked out of the privilege workers housing block for pushing this issue. *Id.* ¶ 18. Officer Ayala then informed Riley that she wanted Plaintiff "out of" the H-Block unit. *Id.* ¶¶ 18–19. On July 28, 2020, Moore warned Plaintiff that if he did not do what correctional staff wanted him to do, Moore would "continue to write [him] up false Disciplinary Reports" that no one would doubt. Doc. 14 at ¶ 27. When Plaintiff asked Moore to let him be, as he did not want any problems, Moore responded, "You should have thought about that before disrespecting my friend Ayala[,]" and then called Plaintiff "a Bitch." *Id.* ¶ 29. At this stage of initial review, these acts suffice to establish an agreement between Ayala and Moore to act in concert to inflict an unconstitutional injury, and constitute overt acts—Ayala's request to remove Plaintiff from H-Block, and Moore's filing of an allegedly false disciplinary report—done in furtherance of that goal, causing damages. *Cf Pangburn*, 200 F.3d at 72. As alleged, these facts also satisfy the exception to intracorporate

conspiracy under which officials "pursu[e] personal interests wholly separate and apart from the entity" they represent, *Vega v. Artus*, 610 F. Supp. 2d at 205, as the Department of Correction has no plausible interest in issuing false disciplinary reports against prisoners who assert religious claims.

With respect to Officer Grady, Plaintiff has alleged that at his disciplinary hearing, Grady kicked Plaintiff out of his office and stated that the only due process Plaintiff would receive was a guilty verdict, as correctional officers are always right. *Id.* ¶ 40. These allegations fail to establish an agreement as required to qualify as a conspiracy and will be dismissed. Similarly, Plaintiff's conspiracy claims against Gamardella and Munroe are wholly conclusory and will be dismissed.

### C. First Amendment Free Exercise

Plaintiff's amended complaint also alleges a violation of the First Amendment's Free Exercise Clause.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *see also O'Lone v. Estate of Shabazz*, 283 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion*."*)*.* However, a prisoner's right to exercise his religion is not absolute and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford*, 352 F.3d at 588 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). To state a First Amendment free exercise claim, a plaintiff must allege facts showing that the defendants' conduct substantially burdened his or her sincerely held religious beliefs. *See Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 274–75); *Ford*, 352 F.3d at 588–91. A belief is substantially

burdened if the defendants have put "substantial pressure" on the plaintiff to modify his or her behavior and to violate his or her beliefs. *See Forde v. Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (citing *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). In considering whether a plaintiff has made the required showing, the court does not evaluate the objective reasonableness of his or her belief but considers only whether the plaintiff "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.

Plaintiff's Complaint, when liberally construed, sufficiently states a free exercise claim under the First Amendment. His allegations suggest that he is an inmate who sincerely holds Muslim beliefs, which include the observance of Ramadan, when only Muslims may serve food to other Muslims. Doc. 14 ¶ 15. He alleges that Officer Ayala intentionally chose a non-Muslim inmate to serve the Muslim inmates' food during Ramadan. *Id.* ¶ 16. The First Amendment Free Exercise Clause protects a prisoner's right to meals that comport with his or her religious requirements. *Ford*, 352 F.3d at 597 (holding that prisoners have a "clearly established" right "to a diet consistent with [their] religious scruples"); *see also McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004) (noting that "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.").

For initial pleading purposes, Ayala's conduct may be construed as putting "substantial pressure" on Plaintiff to modify his behavior and to violate his Muslim beliefs about the proper observance of the fast of Ramadan. Therefore, Plaintiff's First Amendment claim may proceed against Officer Ayala in her individual capacity.

### D. Supervisory Liability for First Amendment Violations

Plaintiff alleges that he notified Warden Guardarama, Deputy Warden Hines, and Acting Commissioner Quiros about the above-described misconduct. Doc. 14 ¶ 41. To the extent that Plaintiff seeks to impose liability on these supervisory defendants for their failure to act after he informed them of the alleged First Amendment violations, Plaintiff's allegations do not plead a viable claim that these supervisory defendants' conduct violated the First Amendment. The Second Circuit has established that a plaintiff must plead that supervisory defendants "violated the Eighth Amendment by [their] own conduct, not by reason of [their] supervision of others who committed the violation." *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020). Because Plaintiff's alleged facts do not meet this standard, any First Amendment claims against Warden Guardarama, Deputy Warden Hines, and Acting Commissioner Quiros are not plausible and will be dismissed.

### E. Eighth Amendment Claims

Plaintiff alleges that Defendants are liable for failure to protect, failure to act, deliberate indifference, unconstitutional confinement, and cruel and unusual punishment. Doc. 14 ¶ 43. The Court construes Plaintiff's claims as asserting violations of his Eighth Amendment rights based on the conditions of confinement in his dorm unit and forced participation in a drug program that exposed him to a risk of contracting COVID-19.[5] *Id.* ¶¶ 25–26, pp. 26–34.

---

[5] To the extent that Plaintiff is claiming that the loss of his work assignment, attending pre-release programming, or RREC credit amounted to an Eighth Amendment violation, such a claim would also necessarily fail. This Court has consistently rejected similar claims. *See Fonck v. Semple*, No. 3:18-CV-1283 (KAD), 2018 WL 4654700, at *5 (D. Conn. Sept. 27, 2018) (dismissing conditions of confinement claim grounded in denial of educational and job opportunities and eligibility for parole); *Torrez v. Semple*, No. 3:17-CV-1232 (SRU), 2018 WL 2303018, at *7 (D. Conn. May 21, 2018) (dismissing Section 1983 claim based on loss of good time credits).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment imposes certain duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care" and to "take reasonable measures to guarantee the safety of the inmates[.]" *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal quotation marks and citations omitted). To state an Eighth Amendment claim of deliberate indifference to health or safety, an inmate must demonstrate both an objective and a subjective element.

To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[] necessit[y]" or a "substantial risk of serious harm." *Id.* at 834 (internal quotation marks and citations omitted). In *Helling v. McKinney,* the Supreme Court held that the Eighth Amendment protects prisoners from an official's deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health. 509 U.S. 25, 33–35 (1993).

To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See Farmer* 511 U.S. at 834, 837. Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).

Plaintiff's claim satisfies the objective element of the Eighth Amendment analysis because "[i]t is undisputed that COVID-19 is a highly dangerous disease that poses a significant risk of

severe illness and death[.]" *Petitpas v. Griffin*, No. 3:20-cv-00769 (JAM), 2020 WL 6826723, at *6 (D. Conn. Nov. 21, 2020) (citation and internal quotation marks omitted). As to the subjective component, Plaintiff's complaint attached letters indicating that he alerted Defendants Warden Guardarama, Deputy Warden Hines, Counselor Supervisor Moore, Counselor Supervisor Gamardella, Counselor Supervisor Riley, Officer Ayala, Lieutenant Davis, Officer Grady, Counselor Albano, and Acting Commissioner Quiros that COVID-19 preventative measures were not being taken in his new housing unit and in the inpatient drug program. Doc. 14 ¶ 39, pp. 26–34. He alleges that no one responded to his letters. *Id.* ¶ 26. Thus, Plaintiff has sufficiently alleged facts to suggest that every one of these Defendants to whom he sent letters complaining of the COVID-19 risk was aware of the risk of harm to Plaintiff but failed to take any steps to protect him from that risk. The court will permit this claim to proceed against Defendants Warden Guardarama, Deputy Warden Hines, Counselor Supervisor Moore, Counselor Supervisor Gamardella, Counselor Supervisor Riley, Officer Ayala, Lieutenant Davis, Officer Grady, Counselor Albano, and Acting Commissioner Quiros.

### F. Violation of the Fourth Amendment

Plaintiff states that all Defendants violated his Fourth Amendment rights. Doc. 14 ¶ 42. The Fourth Amendment protects against unreasonable government search and seizure of persons and property and governs claims arising from excessive force used in connection with an arrest. Plaintiff neither elaborates on his claim of a Fourth Amendment violation nor states facts upon which the Court can find that claim to be plausible. Plaintiff, for instance, makes no allegations that his property was seized or that his cell was searched.

Even if Plaintiff alleged such facts, the Fourth Amendment protections are circumscribed in the prison context. In *Hudson v. Palmer*, the Supreme Court squarely held "that society is not

prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984). *See also Poe v. Leonard*, 282 F.3d 123, 136 (2d Cir. 2002) ("The Fourth Amendment is not the proper source of [the plaintiff]'s constitutional right because [the defendant]'s objectionable conduct occurred outside of a criminal investigation or other form of governmental investigation or activity."). Plaintiff's allegations do not suggest that Defendants' conduct was part of a criminal investigation or any other form of governmental search or investigation. Thus, Plaintiff's claims under the Fourth Amendment must be dismissed.

### G. Violation of the Fifth Amendment

Plaintiff states that all Defendants violated his Fifth Amendment rights. Doc. 14 ¶ 42.

Generally, the Fifth Amendment's Due Process Clause applies to the federal government, not to the states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Ambrose v. City of New York*, 623 F. Supp.2d 454, 466–67 (S.D.N.Y. 2009). Plaintiff has not alleged that a federal official violated his Fifth Amendment rights.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states by the Fourteenth Amendment, is also inapposite.[6] "The Clause protects against both a subsequent prosecution for the same offense after acquittal or conviction as well as multiple punishments for the same offense." *United States v. Hernandez-Fundora*, 58 F.3d 802, 805 (2d Cir.) (internal quotation marks and citation omitted), *cert. denied*, 515 U.S. 1127 (1995). However, the Double Jeopardy Clause is implicated only in proceedings that are "essentially criminal." *Breed v. Jones*, 421

---

[6] The Double Jeopardy Clause provides that a person shall not "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

U.S. 519, 528 (1975); *see United States ex rel. Marcus v. Hess*, 317 U.S. 537, 548–49 (1943) (only "actions intended to authorize criminal punishment to vindicate public justice . . . subject the defendant to 'jeopardy' within the constitutional meaning").

Notably, prison disciplinary proceedings are not criminal prosecutions. *See Wolff v. McDonnell*, 418 U.S 539, 556 (1974); *Hernandez-Fundora*, 58 F.3d at 806 (holding that even though disciplinary sanction may have a punitive component, it is not necessarily punishment for double jeopardy purposes). Accordingly, Plaintiff's Fifth Amendment claims—whether under the Due Process Clause or the Double Jeopardy Clause—are not plausible and must be dismissed.

### H. Violation of the Sixth Amendment

Plaintiff states that all Defendants violated his Sixth Amendment rights. Doc. 14 ¶ 42. Like the Fifth Amendment's Double Jeopardy Clause, the Sixth Amendment is only applicable to criminal prosecutions. *See Sash v. Zenk,* 439 F.3d 61, 63 (2d Cir. 2006) ("Prison disciplinary hearings are not treated as 'criminal' for purposes of the Sixth Amendment."); *Gilliam v. Black*, No. 3:18CV1740 (SRU), 2019 WL 3716545, at *6 (D. Conn. Aug. 7, 2019) (Sixth Amendment applies only to criminal prosecution). Plaintiff has not alleged facts suggesting that the hearing was part of a criminal prosecution.

### I. Interference with Grievance Procedure

Plaintiff alleges that he attempted to exhaust his administrative remedies regarding the conduct of Defendants Albano, Ayala, Moore, Riley, Munroe, Grady, and Gamardella, but Defendants intercepted his complaints so that he could not exhaust his administrative remedies. Doc. 14 ¶ 39. However, Plaintiff cannot allege a plausible Section 1983 claim based on interference with his administrative remedies.

"[I]nmate grievance programs created by state law are not required by the Constitution, and consequently allegations that prison officials violated those procedures do not give rise to a cognizable Section 1983 claim." *Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (citations, alterations, and quotation marks omitted). "Inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly." *Schlosser v. Manuel*, No. 3:19-CV-1444 (SRU), 2020 WL 127700, at *5 (D. Conn. Jan. 10, 2020) (citing *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (claim relating to grievance procedures "confused a state-created procedural entitlement with a constitutional right" and "neither state policies nor 'state statutes . . . create federally protected due process entitlements to specific state-mandated procedures'")).

Moreover, prison staff interference with Plaintiff's administrative remedies does not give rise to a denial of access to the courts in violation of the U.S. Constitution. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002).[7] Rather, the proper judicial remedy for prison officials' alleged interference with Plaintiffs' grievances is to excuse Plaintiff's failure to exhaust his administrative remedies. If prison officials "thwart[ed] [Plaintiff] from taking advantage of a grievance process through machination, misrepresentation, or intimidation[,]" he would be excused from exhausting the grievance procedure because the administrative remedies would be considered unavailable, allowing him to proceed to federal court. *See Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016) (explaining exception to exhaustion requirement when administrative remedies are unavailable). Accordingly, Plaintiff's claim of denial of access to the courts must be dismissed as not plausible under 28 U.S.C. § 1915A(b)(1).

---

[7] The right of access to the courts may arise under the Privileges and Immunities Clause of Article IV, section 2, the Petition Clause of the First Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment. *See id.*

### J. Failure to Investigate Misconduct

To the extent that Plaintiff asserts a constitutional violation based on authorities' failure to investigate Defendants' misconduct, *see* Doc. 14 ¶ 35, his claim must fail, as a private citizen has no "constitutional right to an investigation of any kind by government officials." *Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted); s*ee also Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (inmates alleging beating by prison guards lack standing to challenge prison officials' request to magistrate not to issue arrest warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Joyce v. Hanney*, No. 3:05cv1477 (WWE), 2009 WL 563633, at *9 (D. Conn. Mar. 4, 2009) (prisoner has no constitutional right to have defendants disciplined or prosecuted). This claim must be dismissed as not plausible.

### K. Intentional Infliction of Emotional Distress

Plaintiff asserts a state common law claim of intentional infliction of emotional distress. Doc. 14 ¶ 43. To state such a claim under Connecticut law, one must allege that (1) the defendants intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of their conduct; (2) the defendants' conduct was extreme and outrageous; (3) the defendants' conduct was the cause of the plaintiff's distress; and (4) the resulting emotional distress sustained by the plaintiff was severe. *Appleton v. Bd. of Educ. of Stonington*, 254 Conn. 205, 210 (2000). The Connecticut Supreme Court has defined extreme and outrageous conduct as that which "exceeds all bounds usually tolerated by decent society." *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 443 (2003) (internal citation omitted). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community."

*Id.* The conduct must be such that "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.*

Whether "conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the court." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (citing *Johnson v. Chesebrough–Pond's USA Co.*, 918 F. Supp. 543, 552 (D. Conn. 1996)). Only where reasonable minds might disagree does it become an issue for the jury. *DiTeresi v. Stamford Health System, Inc.*, 63 A.3d 1011, 1020 (2013).

Here, Plaintiff has alleged facts suggesting that Officer Ayala intentionally subjected Plaintiff to conditions that violated his religious beliefs and that Counselor Supervisors Riley and Moore issued Plaintiff with false disciplinary reports that would result in his placement in a dorm unit where COVID-19 measures were not being implemented and where Plaintiff ultimately contracted COVID-19. Doc. 14 ¶¶ 13–23, 26; pp 26–33. This conduct satisfies, at this stage of review, the standard under Connecticut law, as Plaintiff's allegations lead to the conclusions that (1) Defendants Ayala, Riley, and Moore intended to inflict emotional distress on Plaintiff by causing him to lose his housing and be moved to a dorm unit at higher risk for COVID-19, all in an effort to retaliate for Plaintiff's well-founded complaints about his treatment in prison; (2) the average member of the community would consider this conduct extreme and outrageous; (3) this conduct was the cause of Plaintiff's distress, as it prevented him from living in a single cell, working in prison, receiving early release, or attending programs to assist with his reintegration, and also led to his ultimately contracting COVID-19, Doc. 14 ¶ 36; and (4) Plaintiff's resulting emotional distress was severe. However, the alleged conduct by the other defendants fails to suggest that they acted intentionally to cause Plaintiff emotional distress in a manner that is intolerable to a civilized community.

The Court will accordingly permit Plaintiff's intentional infliction of emotional distress claim to proceed against only Officer Ayala and Counselor Supervisors Riley and Moore. 28 U.S.C. § 1915A(b)(1).

### L. Claims against Operations Officer John or Jane Doe

Plaintiff must allege facts to establish the personal involvement of each defendant in an alleged constitutional violation in order to hold that defendant liable for an award of damages under § 1983. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). Plaintiff has not alleged any facts concerning the conduct of Operations Officer John or Jane Doe in the body of the Complaint, and he has not stated plausible requests for injunctive relief for which this Defendant or these Defendants would have the power to provide the requested relief. *See Ex parte Young*, 209 U.S. 123, 157 (defendant official must have some connection with enforcement of allegedly unconstitutional act). Accordingly, the Court must dismiss without prejudice all claims against John or Jane Doe.

### M. Official Capacity Claims

In his request for relief, Plaintiff seeks monetary relief against all Defendants and names all Defendants in their individual and official capacities. Doc. 14 ¶ 44. But any claims for monetary damages against the defendants, who are state employees, in their official capacities are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "That is so because a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents . . . ." *Id.* (citation and internal quotation marks omitted). Accordingly, to the extent that Plaintiff asserts claims for monetary damages against the defendants in their official capacities, the claims will be dismissed.

**CONCLUSION**

For the foregoing reasons, the Court enters the following orders:

(1) With respect to the claims raised in the Second Amended Complaint:

    A.  Plaintiff's Fourteenth Amendment due process claims are DISMISSED without prejudice.

    B.  Plaintiff's First Amendment retaliation claims shall proceed against Officer Ayala, Counselor Supervisor Riley, and Counselor Supervisor Moore. Plaintiff's First Amendment retaliation claims against all other Defendants are DISMISSED without prejudice.

    C.  Plaintiff's First Amendment Free Exercise claim shall proceed against Officer Ayala.

    D.  Plaintiff's claims of supervisory liability for First Amendment violations against Warden Guardarama, Deputy Warden Hines, and Acting Commissioner Quiros are DISMISSED without prejudice.

    E.  Plaintiff's Eighth Amendment deliberate indifference claims shall proceed against Warden Guardarama, Deputy Warden Hines, Counselor Supervisor Moore, Counselor Supervisor Gamardella, Counselor Supervisor Riley, Officer Ayala, Lieutenant Davis, Officer Grady, Counselor Albano, and Acting Commissioner Quiros.

    F.  Plaintiff's Fourth Amendment claims are DISMISSED without prejudice.

    G.  Plaintiff's Fifth Amendment claims are DISMISSED without prejudice.

    H.  Plaintiff's Sixth Amendment claims are DISMISSED without prejudice.

    I.  Plaintiff's claims under Section 1983 and the Constitution concerning interference with the administrative grievance procedure are DISMISSED without prejudice.

J.  Plaintiff's claims of a constitutional violation concerning authorities' failure to investigate Defendants' misconduct are DISMISSED without prejudice.

K.  Plaintiff's state law claims of intentional infliction of emotional distress shall proceed against Officer Ayala, Counselor Supervisor Riley, and Counselor Supervisor Moore. Plaintiff's claims of intentional infliction of emotional distress against all other Defendants are DISMISSED without prejudice.

L.  Plaintiff's claims against Operations Officer John or Jane Doe are DISMISSED without prejudice.

M.  To the extent that Plaintiff seeks relief against any Defendant in his or her official capacity, such claims are DISMISSED without prejudice. Plaintiff's claims shall proceed only insofar as they seek monetary relief against Defendants in their individual capacities.

Plaintiff may file, within thirty (30) days of this Order's filing date, an amended complaint to correct the deficiencies identified in this Order.

Plaintiff is advised that any amended complaint will completely replace the prior complaint in the action, and that no portion of any prior complaint may be incorporated into his amended complaint by reference.

(2) The Clerk of Court shall verify the current work addresses for Warden Guardarama, Deputy Warden Hines, Counselor Supervisor Moore, Counselor Supervisor Gamardella, Counselor Supervisor Riley, Officer Ayala, Lieutenant Davis, Officer Grady, Counselor Albano, and Acting Commissioner Quiros with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the amended complaint and this order to them at their confirmed

addresses within **twenty-one (21) days** of this Order, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing.

If any Defendant fails to return the waiver request, the Clerk shall arrange for in-person individual capacity service by the U.S. Marshals Service on that Defendant, and that Defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The Clerk shall send a courtesy copy of the Second Amended Complaint (Doc. 14) and this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(4)   The Clerk shall correct the docket to reflect that the Defendant whose name is currently spelled "Gamodela" should be spelled "Gamardella."

(5) The Clerk shall terminate as parties to this case Industries Supervisor Rey Munroe and Operations Officer John or Jane Doe.

(6) Defendants shall file their response to the Second Amended Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to him. If Defendants choose to file an answer, Defendants shall admit or deny the allegations and respond to the cognizable claims recited above. Defendants may also include any and all additional defenses permitted by the Federal Rules.

(7) Discovery, according to Federal Rules of Civil Procedure 26–37, shall be completed within **six months (180 days)** from the date of this Order. Discovery requests need not be filed with the Court.

(8) The Parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to all Parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(9) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

(10) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(11) If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify Defendants or defense counsel of his new address.

(12) If incarcerated, Plaintiff shall use the Prisoner Efiling Program when filing documents with the Court. He is advised that the Program may be used only to file documents with the Court. Local rules provide that discovery requests are not filed with the Court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on Defendants' counsel by regular mail.

It is **SO ORDERED**.


Dated: September 20, 2022
New Haven, Connecticut

/s/ Charles S. Haight, Jr.
Charles S. Haight, Jr.
Senior United States District Judge